AUBURN CORDAGE, INC., Auburn Campground, LLC, and Classic City Camping, LLC, Appellants–Defendants,

v.

The REVOCABLE TRUST AGREEMENT OF Bryce B. TREADWELL, Estate of Bryce B. Treadwell, Cindee Crosby, Misty Treadwell, and Terry R. Freeman and April K. Freeman, Appellees–Plaintiffs.

No. 17A04–0503–CV–132.

Court of Appeals of Indiana.

June 7, 2006.

---

Shannon Kruse Julien, Auburn, Attorney for Appellants.

James O. Waanders, Auburn, Attorney for Appellees.

## OPINION

SULLIVAN, Judge.

Appellants–Defendants, Auburn Cordage, Inc. and Auburn Campground, LLC,

challenge the trial court's grant of summary judgment in favor of Appellees–Plaintiffs, the Revocable Trust Agreement of Bryce B. Treadwell, the Estate of Bryce B. Treadwell, Cindee Crosby, Misty Treadwell, and Terry and April Freeman. The Appellants claim that the trial court erred in granting summary judgment because genuine issues of material fact exist with regard to whether the Estate is entitled to recover, under a theory of equitable subrogation, the sums paid to Union Federal Bank from certain life insurance policies assigned as collateral for a loan to Classic City Camping, LLC.[1] The Appellants further claim that the trial court erred in granting summary judgment because genuine issues of material fact exist with regard to whether Classic City was in default under a loan with the Bank, and whether the mortgage agreement between Auburn Cordage and the Bank was supported by adequate consideration. The Appellants also claim that the trial court exceeded its authority in concluding that foreclosure is appropriate.

We affirm in part, reverse in part, and remand.

The facts in the light most favorable to the non-moving parties reveal that Dr. Treadwell organized Classic City to operate a campground on land owned by Auburn Cordage.[2] The original members of Classic City were Dr. Treadwell and his first wife, Rhea Treadwell, who predeceased Dr. Treadwell.[3] Auburn Cordage leased the property to Classic City pursuant to a 99–year lease agreement entered into on February 7, 1995. To obtain initial capital, Classic City procured a $500,000 loan from the Bank. On March 11, 1996, Classic City, acting through its "Manager" Dr. Treadwell, executed a security agreement with the Bank which created a lien on various assets of Classic City, including all improvements to be attached to and all rents to be derived from the campground property. App. at 117. Also on March 11, Dr. Treadwell signed an agreement which assigned as collateral the proceeds of a life insurance policy he owned in order to secure the loan from the Bank. The policy was obtained through the Ohio Life Insurance Company ("Ohio Life").[4] Dr. Treadwell formerly practiced medicine with Dr.

1. For brevity's sake, we will refer to Classic City Camping, LLC as "Classic City," to Auburn Cordage, Inc. as "Auburn Cordage," to Auburn Campground, LLC as "Auburn Campground," and to Auburn Cordage and Auburn Campground collectively as "the Auburn companies." We will refer to the Trust Agreement of Bryce B. Treadwell as "the Trust," to the Estate of Bryce B. Treadwell as "the Estate," to Cindee Crosby and Misty Treadwell as "Cindee" and "Misty" respectively, and to the Appellees–Plaintiffs collectively as "the Appellees." We will refer to Bryce B. Treadwell as "Dr. Treadwell," and to Union Federal Bank as "the Bank." The Freemans, whose roles are explained infra, have not filed an appearance in this appeal and are therefore only nominal appellees. *See* Ind. Appellate Rule 17(A) ("A party of record in the trial court ... shall be a party on appeal.").

Classic City was originally an active appellant in this appeal. However, on March 17, 2005, Classic City and the Appellees filed a verified joint motion to dismiss Classic City's appeal. In the joint motion, Classic City and the Appellees explain that the dispute between them has been settled through Classic City's Chapter 11 Bankruptcy Plan. We hereby grant the motion to dismiss Classic City's appeal.

2. On June 30, 2000, Auburn Cordage transferred ownership of the property by quitclaim deed to a related entity, Auburn Campground.

3. The Appellees assert in their brief that Rhea Treadwell died on May 17, 1996. However, the pages of the Appendix to which they cite simply demonstrate that Rhea Treadwell predeceased Dr. Treadwell and do not indicate precisely when she died.

4. On October 2, 1995, Great Southern Life Insurance Company, a wholly-owned subsidiary of Americo Life, "assumed a block of insurance policies previously serviced by The

Stanley Greenburg. Dr. Greenburg owned a policy insuring Dr. Treadwell's life in the amount of $150,000 with Dr. Greenburg named as the beneficiary. When the medical partnership split up, Dr. Treadwell assumed ownership of the policy, but Dr. Greenburg remained the named beneficiary. When Dr. Treadwell assigned the policy as collateral, Dr. Greenburg was still the only named beneficiary.

The assignment agreement provided as follows:

"A. For Value Received the undersigned hereby assign, transfer and set over to Union Federal Savings Bank of Indianapolis, Indiana its successors and assigns, (herein called the "Assignee") Policy No. 8408184 issued by the Ohio Life Insurance Company (herein called the "insurer") and any supplementary contracts issued in connection therewith (said policy and contracts being herein called the "Policy"), upon the life of Bryce B Treadwell of Auburn, Indiana and all claims, options, privileges, rights, title and interest therein and thereunder (except as provided in Paragraph C hereof), subject to all terms and conditions of the Policy and to all superior liens, if any, which the Insurer may have against the Policy. The undersigned by this instrument jointly and severally agree and the Assignee by the acceptance of this assignment agree to the conditions and provisions herein set forth.

B. *It is expressly agreed that, without detracting from the generality of the foregoing, the following specific rights are included in this agreement and pass by virtue hereof:*

1. *The sole right to collect from the Insurer the net proceeds of the Policy when it becomes a claim by death or maturity;*

2. The sole right to surrender the Policy and receive the surrender value thereof at any time provided by the terms of the Policy and at such other times as the Insurer may allow;

3. The sole right to obtain one or more loans or advances on the Policy, either from the Insurer or, at any time, from other persons, and to pledge or assign the Policy as security for such loans or advances;

4. The sole right to collect and receive all distributions or shares of surplus dividend deposits or additions to the Policy now or hereafter made or apportioned thereto, and to exercise any and all options contained in the Policy with respect thereto; and

5. The sole right to exercise all nonforfeiture rights permitted by the terms of the Policy or allowed by the Insurer and to receive all benefits and advantages derived therefrom.

C. *It is expressly agreed that the following specific rights, so long as the Policy has not been surrendered, are reserved and excluded form [sic] this assignment and do no pass by virtue hereof:*

1. *The right to designate and change the beneficiary;*

2. The right to elect optional modes of settlement;

but the reservation of these rights shall in no way impair the right of the Assignee to surrender the Policy completely with all its incidents or impair any other right of the Assignee hereunder, and any designation or change of beneficiary or election of a mode of settlement shall be made subject to this assignment and the rights of the Assignee hereunder.

Ohio Life Insurance Company," including Dr. Treadwell's $150,000 policy. App. at 336.

D. *This assignment is made and the Policy is to be held as a collateral security for any and all liabilities of the undersigned, or any of them, to the Assignee, either now existing or that may hereafter arise in the ordinary course of business between any of the undersigned and the Assignee (all of which liabilities secured or to become secured are herein called "Liabilities"). It is expressly agreed that all sums received by the Assignee hereunder, either in event of death of the insured, the maturity or surrender of the Policy, the obtaining of a loan or advance on the Policy, or otherwise, shall first be applied to the payment of one or more of the following in such order of preference as the Assignee shall determine: (a) principal of and/or interest on Liabilities; (b) premiums on the Policy; (c) principal of and/or interest on loans or advances made by the Insurer on the Policy.*

E. The Assignee covenants and agrees with the undersigned as follows:

1. *That any balance of sums received hereunder from the Insurer remaining after payment of the then existing Liabilities shall be paid by the Assignee to the persons entitled thereto under the terms of the Policy had this assignment not been executed;*

2. That the Assignee will not exercise either the right to surrender the Policy or (except for the purpose of paying premiums) the right to obtain policy loans from the Insurer, until there has been default in any of the Liabilities or a failure to pay any premiums when due, nor until twenty days after the Assignee shall have been mailed, by first-class mail, to the undersigned at the address given hereinabove, notice of intention to exercise such rights; and

3. That the Assignee will upon request forward without unreasonable delay to the Insurer the Policy for endorsement of any designation or change of beneficiary or any election of an optional mode of settlement." App. at 357 (emphasis supplied).

Also on March 11, Auburn Cordage entered into an agreement with the Bank assigning its rights to leases and rents from the campground property to secure the payment of Classic City's loan.

Thereafter, on November 8, 1996, the $500,000 loan was "reorganized" by Classic City and the Bank. Classic City obtained a Small Business Administration guaranty of its $500,000 loan, and a note evidencing the loan was executed and delivered to the Bank that day. Dr. Treadwell, along with his daughter and son-in-law, April and Terry Freeman, executed personal guaranties of the $500,000 loan.[5] Although there

5. The Freemans' role is somewhat unclear. The Auburn companies claim in their brief that the Freemans were "original principals" of Classic City, but they cite in support of this only the guaranty signed by the Freemans. This document does not indicate that the Freemans were principals, original or otherwise, of Classic City. To be sure, the affidavit of John Martin Smith, the attorney for the Estate and Trust, states that Dr. Treadwell and his first wife Rhea were the original members of Classic City.

In addition to signing the guaranties of Classic City's loan, the Freemans invested $30,000 in Classic City and were promised twenty percent ownership in the company. Although they did not receive their membership interests, they advanced an additional $2,000 and a lawn mower worth $3,000 to Classic City. They were also hired by Classic City and were to be paid $300 per week. Dr. Treadwell became unsatisfied with the Freemans' work and fired them in February of 1998. In June of 1998, the Freemans sued Classic City and Dr. Treadwell, claiming the return of their investments of $35,000 and for unpaid wages in the amount of $21,000. On March 21, 2001, after Dr. Treadwell's death,

is no indication that the Freemans pledged any collateral, Dr. Treadwell executed liens in favor of the Bank on his residence and motor home as additional collateral. Also on November 8, 1996, Auburn Cordage executed a mortgage in favor of the Bank to secure payment of the loan and executed a subordination and lease modification agreement with Classic City.[6]

Also in November of 1996, Dr. Treadwell executed a document entitled "The Revocable Trust Agreement of Bryce B. Treadwell," which was subsequently amended on December 7, 1998. Pursuant to the Trust Agreement, certain assets of Dr. Treadwell, including his residence and his membership interest in Classic City, were titled to the Trust. Dr. Treadwell's will provided that the assets of his Estate were to "pour over" into the Trust, and the Trust was empowered to pay the debts of the Estate. Under the Trust Agreement, Dr. Treadwell's second wife and surviving spouse, Stephanie Treadwell, is the beneficiary of the membership interest in Classic City—the sole provision made for her. Two of Dr. Treadwell's four children, Cindee and Misty, are the residual beneficiaries.[7] The Trust Agreement named Stephanie Treadwell as co-trustee of the Trust and Dr. Treadwell's will named Stephanie as co-personal representative of the Estate. Along with Stephanie, the Trust Agreement and will named Dr. Treadwell's attorney, John Martin Smith, as co-trustee and co-personal representative respectively.

In February of 1997, Classic City obtained additional funding by obtaining an-other loan from the Bank in the amount of $54,000, which loan was evidenced by a promissory note dated February 11, 1997. To secure this note, Dr. Treadwell again executed a personal guaranty of the loan. As additional security, Dr. Treadwell assigned the proceeds of four life insurance policies obtained through Fidelity Insurance Company ("Fidelity"), each with a face value of $15,000. The Fidelity policies were purchased between 1963 and 1972 and named Dr. Treadwell's first wife, Rhea, as the primary beneficiary and Dr. Treadwell's children as contingent beneficiaries. The assignments stated that the Fidelity policies were "assign[ed] and transfer[ed]" to the Bank along with "all moneys now or hereafter payable thereunder, subject to the conditions of said policy, the regulations of the Company and to any lien, charge, or indebtedness thereon now or hereafter existing in favor of said Company." App. at 278, 296, 313, 334.

Dr. Treadwell died on February 15, 2000. Pursuant to the Trust Agreement and the will, Stephanie and attorney Smith were appointed co-personal representatives of the Estate and co-trustees of the Trust. Because the death of Dr. Treadwell, a guarantor of Classic City's loans, was an event of default pursuant to the loan agreement, the Bank demanded payment from the Estate for the amount of the loans, which at the time of Dr. Treadwell's death had a balance of approximately $450,000. Thereafter, the Estate and Trust began to liquidate the assets pledged as collateral for the loans, includ-

---

the trial court entered an order denying the Freemans' claims against the Estate but awarding them a judgment of $69,317.27 against Classic City.

**6.** Apparently, the Auburn companies' relationship with Classic City was only as the landlord and owner of the property on which Classic City operated its campground; there is no indication that the Auburn companies are otherwise involved in the management of Classic City.

**7.** The Trust Agreement made no provision for Dr. Treadwell's daughter April Freeman and left Dr. Treadwell's son Christopher $1,000.

ing Dr. Treadwell's motor home and Dr. Treadwell's residence. The proceeds were then applied to the loan balances. The Trust also continued to make monthly payments totaling $21,679.25. In addition, pursuant to the assignments of the four Fidelity policies, Fidelity paid $45,620.91 to the Bank, and pursuant to the assignment of the $150,000 policy, Ohio Life paid the Bank $153,060.28.[8]

On August 3, 2000, Dr. Treadwell's daughters Cindee and Misty intervened in the estate proceedings and petitioned to remove their stepmother Stephanie as co-personal representative of the Estate and co-trustee of the Trust. On November 27, 2000, the DeKalb Circuit Court entered an order on "Indemnification Issues and Removal Issues," which read in pertinent part:

"13. The ... Bank has chosen to primarily pursue collection on its loan from [Dr.] Treadwell (now his Estate) based on his personal guaranty rather than from the borrower Classic City....

14. The Co–Personal Representatives for the Estate have the duty to pay [Dr.] Treadwell's debts.

* * *

17. However, to the extent the Estate (the guarantor) pays the ... Bank indebtedness, it has the legal right to seek indemnification from Classic City ... (the borrower); a personal guarantor called upon to pay for the borrower's debt has the legal and equita-

ble right to seek indemnity from the borrower who defaulted.

* * *

19. Since Stephanie G. Treadwell stands to become owner of 100% of the membership interest in Classic City ... she has a built-in conflict of interest: her duty as Co–Personal Representative for the Estate to pursue indemnification from Classic City ... conflicts with her interest in not diminishing the financial value of her future membership interest in Classic City....

* * *

21. Therefore, Stephanie G. Treadwell should be removed and the Court does now hereby order her removal, effective immediately, as a Co–Personal Representative for the Estate....

22. Because Stephanie G. Treadwell is no longer a Co–Personal Representative for the Estate, she does not have a conflict of interest in continuing to serve as Co–Trustee for the Trust so the Court does not order her removal as Co–Trustee for the Trust."[9] App. at 372–73.

On February 12, 2002, Stephanie was removed as co-trustee.[10]

On June 27, 2002, following the removal of Stephanie as co-personal representative of the Estate, the Estate purchased the promissory notes securing the loan from the Bank by paying approximately $124,-000—the outstanding balance on the loan.

---

**8.** Although it is not entirely clear that the $54,000 loan was paid off at this point, there is some indication that this is what happened. The Bank had earlier demanded payment on two promissory notes. When the Estate purchased the notes from the Bank, however, only the larger $500,000 loan was mentioned. The parties also generally refer to a singular

"loan." We therefore proceed assuming that only the larger loan is at issue.

**9.** This order was not challenged, nor is it now challenged upon appeal.

**10.** The parties do not explain why or how Stephanie was removed as co-trustee.

This sale was accomplished through an "Assignment Agreement without Recourse" between the Estate and the Bank. Under this assignment, the Bank assigned its rights in the notes and other loan documents to the Estate.

On July 10, 2002, the trial court appointed Cindee and Misty's attorney to act as "special counsel" for the Estate and Trust in order to pursue a claim of indemnification against Classic City and a claim of equitable subrogation to the rights of the Bank against Classic City and the Auburn companies. Two days later, the Estate, Trust, Cindee, and Misty filed the complaint which led to the current appeal, seeking contribution from co-guarantors April and Terry Freeman[11] and foreclosure on the Auburn Cordage mortgage, and requesting that Classic City be placed in receivership.

In June of 2003, Dr. Greenburg disclaimed any interest he had in the Ohio Life policy proceeds. On September 5, 2003, the Appellees filed their motion for summary judgment. On November 4, 2003, Classic City filed a petition for reorganization under Chapter 11 of the federal Bankruptcy Code in the United States Bankruptcy Court for the Northern District of Indiana. The Bankruptcy Court then issued an automatic stay, which froze the Indiana court proceedings.

On August 5, 2004, the Bankruptcy Court issued an order partially releasing the automatic stay, which reads in relevant part:

"IT IS THEREFORE ORDERED, ADJUDGED AND DECREED [that] Treadwell [i.e., the Appellees] [are] granted relief from the Automatic Stay to proceed with [their] action . . . in the DeKalb Circuit Court solely against the Debtor, Classic City Camping, LLC, Auburn Cordage, Inc., Auburn Campground, LLC, Terry R. Freeman and April K. Freeman (collectively the "Defendants") in order for the DeKalb Circuit Court and any appellate court in the State of Indiana on direct appeal, to determine the proper amount of any claim held by Treadwell against the Defendants and the extent to which any claim by Treadwell against the Defendants is secured by the real property subject to the state court action.

IT IS FURTHER ORDERED that the parties shall return to Bankruptcy Court once a final non-appealable order is entered liquidating Treadwell's Claim for administration by the Bankruptcy Court of this case in accordance with the State Court Judgment. Treadwell is in no way permitted to execute upon any asset of the Debtor's Bankruptcy Estate without further order from this Court." App. at 418A–418B.

With this partial release from the stay, Classic City filed its designation of evidence and brief in opposition to the Appellees' motion for summary judgment on October 15, 2004. Classic City conceded that the Estate and Trust have a right to indemnity against Classic City, but argued that there were genuine issues of material fact with regard to whether the loan was

11. The portion of the complaint regarding the Freemans alleged that "[t]he Plaintiffs have a right to contribution from the other guarantors, Terry Freeman and April Freeman, for the sums they have paid on the Loan that are not repaid by Classic City." App. at 103. Thus, according to the Appellees, they were seeking contribution from the Freemans only to the extent that they do not or cannot collect from Classic City. Although Classic City's Bankruptcy Plan apparently settles the dispute with regard to Classic City's liability to the Appellees, the Freemans' liability is not mentioned in the joint motion to dismiss Classic City as an appellant.

in default and with regard to the issue of equitable subrogation.[12]

After the Appellees filed a reply brief and additional designated evidence, the trial court held a summary judgment hearing on November 20, 2004. On February 8, 2005, the trial court entered an order granting summary judgment in favor of the Appellees. Classic City and the Auburn companies filed notices of appeal on March 7 and 9, 2005, respectively.

### Summary Judgment

 Summary judgment is appropriate only where the designated evidentiary matter shows that there are no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law. *Rector v. Oliver*, 809 N.E.2d 887, 889 (Ind.Ct.App.2004) (citing Ind. Trial Rule 56(C)), *trans. denied.* When reviewing a grant of a motion for summary judgment, we stand in the shoes of the trial court. *Id.* Once the moving party demonstrates, prima facie, that there are no genuine issues of material fact as to any determinative issue, the burden falls upon the non-moving party to come forward with contrary evidence. *Id.* The non-moving party may not rest upon the pleadings but must instead set forth specific facts, using supporting materials contemplated under Trial Rule 56, which show the existence of a genuine issue for trial. *Burgess v. E.L.C. Elec., Inc.*, 825 N.E.2d 1, 5 (Ind.Ct.App.2005), *trans. denied.* The party appealing the grant of summary judgment bears the burden of persuading this court that the trial court erred, but we still carefully scrutinize the entry of summary judgment to ensure that the non-prevailing party was not denied its day in court. *Id.* We do not weigh the evidence

but rather consider the facts in the light most favorable to the nonmoving party. *Id.* We may sustain the judgment upon any theory supported by the designated evidence. *Rector*, 809 N.E.2d at 889. The trial court here entered specific findings of fact and conclusions thereon. Although such findings and conclusions facilitate appellate review by offering insight into the trial court's reasons for granting summary judgment, they do not alter our standard of review and are not binding upon this court. *Burgess*, 825 N.E.2d at 5.

### I

### Default

 The Auburn companies argue that the trial court's grant of summary judgment was in error to the extent that it concluded that Classic City was in default under the loan with the Bank. They contend that Classic City designated evidence demonstrating that Classic City was not in default. The Auburn companies claim that the Bank did not accelerate the loan payments, and refers specifically to a letter sent by the Bank to the Estate stating, "[A]lthough events of default have occurred, [the Bank] has not elected to accelerate the balance due on the loan." App. at 436. The Auburn companies contend that because the Appellees presented no evidence to counter this, the trial court erred in determining that the loan was in default.

We discern no error in the trial court's conclusion. Even Classic City's designated evidence admits that "events of default have occurred." App. at 436. The Bank sent another letter to the Estate which stated that the Bank would "require payment in full [on the loans] as the death of

---

**12.** The Auburn companies had previously filed a response to the Appellees' motion for summary judgment on November 5, 2003.

Bryce Treadwell, a guarantor of the loans, is an event of default according to the Loan Agreement dated November 8, 1996." App. at 235. More importantly, the loan agreement itself contained a section entitled "Events of Default," which states, "Borrower *shall be in default* under this Agreement upon the occurrence of any one or more of the following events ('Events of Default') ... if there shall occur the *death*, bankruptcy or dissolution *of any guarantor* of the Loan Documents...." App. at 114 (emphasis supplied). It is undisputed that Dr. Treadwell died. Thus, by the very terms of the loan agreement, and whether or not the loan had been accelerated at the time, the loan was in default upon the death of Dr. Treadwell. We cannot say that the trial court erred in concluding that the loan was in default.

## II

### *Consideration*

■■■■ The Auburn companies next argue that the trial court erred in concluding that there was adequate consideration for the mortgage which Auburn Cordage signed to secure the loan to Classic City. It is well settled that it is not proper for courts to inquire into the adequacy of consideration. *Putz v. Allie*, 785 N.E.2d 577, 579 (Ind.Ct.App.2003), *trans. denied*; *Hamlin v. Steward*, 622 N.E.2d 535, 539 (Ind.Ct.App.1993); *Harrison–Floyd Farm Bureau Co-op. Ass'n, Inc. v. Reed*, 546 N.E.2d 855, 857 (Ind.Ct.App.1989). Moreover, consideration need not be of benefit to the party making the promise. *Timberlake v. J.R. Watkins Co.*, 138 Ind.App. 554, 560, 209 N.E.2d 909, 912 (1965), *reh'g denied by* 138 Ind.App. 554, 211 N.E.2d 193, *trans. denied*. Although the Auburn companies are correct in noting that a mortgage must be supported by consideration to be enforceable, any consideration which

will sustain a promise to pay will suffice, and it is not necessary that the obligee actually give anything of value to the obligor. *Huntingburg Prod. Credit Ass'n v. Griese*, 456 N.E.2d 448, 451 (Ind.Ct.App. 1983). Sufficient consideration will be found if it is shown that the mortgagee suffered any damage, inconvenience, detriment or loss, or that he extended any forbearance in reliance upon the mortgage. *Id.* Consideration exists if it is shown that any right, profit, benefit accrued to the mortgagor, or that responsibility was suffered or undertaken by another. *Id.*

■■■ Per the terms of the mortgage between Auburn Cordage and the Bank, the mortgage was given to "secure the payment of a promissory note ... in the principal sum of $500,000.00 signed by Bryce B. Treadwell on behalf of Classic City Camping...." App. at 176. The Auburn companies refer to the designated affidavit of Dean Kruse, the President of Auburn Cordage and Operating Manager of Auburn Campground, which affidavit avers that "no money or other monetary consideration was given to Auburn Cordage, Inc. upon the signing of the Mortgage between Auburn Cordage, Inc. and [the Bank]...." App. at 416. Kruse further swore in his affidavit that:

"based upon the conversations and agreements between myself, Auburn Cordage, Inc. and Classic City Camping and Bryce Treadwell was that [sic] of Landlord and Tenant and ... I understood that Bryce Treadwell and Classic City Camping did not expect Auburn Cordage to be liable for the debts of Classic City Camping and that the Real Estate would never be at risk of being taken from Auburn Cordage.

[T]here was no joint venture, partnership or joint enterprise between Auburn Cordage, Inc. and Bryce Treadwell and Classic City Camping ... at any time

relevant to this cause of action." App. at 416.

The Auburn companies now posit that since no evidence was designated which contradicted this, summary judgment upon the issue of consideration was improper. We cannot agree.

Auburn Cordage mortgaged its property to secure a loan to its tenant, Classic City. It is undisputed that the loan secured by the mortgage was used "for the erection of the buildings and improvements for the campground." Brief of Auburn Cordage at 3. Thus, with the funding obtained from the loan secured by the mortgage, Auburn Cordage's tenant Classic City was able to start its campground business. Classic City received a benefit, and this is consideration sufficient to support the mortgage. See Timberlake, 138 Ind.App. at 560, 209 N.E.2d at 912 (consideration need not be of benefit to the party making the promise). By receiving rents from Classic City through the lease agreement, Auburn Cordage indirectly benefited from the loan secured by the mortgage. See Griese, 456 N.E.2d at 451 (consideration exists if it is shown that any right, profit, benefit accrued to the mortgagor, or that responsibility was suffered or undertaken by another). The trial court did not err in concluding that the mortgage was supported by consideration.

### III

### Life Insurance Proceeds

The Auburn companies' main argument is that the trial court erred with regard to the rights of the parties vis-à-vis the life

insurance policies owned by Dr. Treadwell and assigned as collateral. In their complaint, the Appellees claimed that "[e]ach of the Plaintiffs have an equitable right of indemnity against Classic City for sums paid as a result of Dr. Treadwell's guarantees [sic], and they are subrogated and succeed to all of the rights of the Bank." App. at 103. The complaint further alleged that "[b]ecause Classic City is in default and fails and refuses to pay the Note, the Plaintiffs are exercising their rights to declare all sums thereunder due and payable, to foreclose all interests in the [campground] Real Estate, and to demand that all rents from Classic City due under the Lease be paid directly to the Estate henceforth...." App. at 104.

Because of the somewhat complex nature of the situation before us, we consider some clarification to be appropriate. First, it is undisputed by the parties that the Estate may properly seek "indemnity" from Classic City for the money the Estate, as guarantor, spent paying towards Classic City's loans.[13] See Ross v. Menefee, 125 Ind. 432, 25 N.E. 545 (1890) (although surety who pays debt of principal before maturity cannot maintain an action against the principal until the time for payment has expired, if surety is not paid at that time, he may sue to recover the amount which he has paid in discharge of the debt); 38 Am.Jur.2d Guaranty § 120 (1999) (guarantor may invoke the doctrine of "subrogation" when the principal debtor has defaulted in the payment or performance of his obligation and the creditor has enforced the contract of guaranty).[14] This

13. This would include amounts the Estate paid on the loans by liquidating assets such as Dr. Treadwell's residence and motor home.

14. As noted in the American Jurisprudence article, "the term 'subrogation' has been somewhat loosely used by courts to include various rights which arise in favor of a guar-

antor upon his or her payment of a debt upon default by the principal debtor, including the rights of indemnity (or reimbursement), contribution from coguarantors, subrogation, and exoneration." Id. Here, mainly to distinguish a guarantor's rights from the right of equitable subrogation applicable to insurance bene-

is essentially what the trial court concluded in its order of November 7, 2002. (A–372–73).

In addition, as the current holder of the loan note, the Estate may demand payment on the note in the same manner as could the Bank. By assuming the role of the creditor through purchasing the note, the Estate may seek repayment from any of those obligated to account for the debt remaining at the time of the purchase, i.e., Classic City as the principal debtor, Auburn Cordage as the mortgagor of the property mortgaged to secure the debt, and, ironically, the Estate itself as guarantor of the loan it now holds.

The issue in this case is not whether the Estate, as the guarantor of Classic City's loans, can seek "indemnity" from Classic City, nor whether the Estate, as holder of the note, may seek repayment of the balance remaining on the loan, but rather it involves the proceeds of the life insurance policies purchased by Dr. Treadwell. Instead of going to the beneficiaries of the policies, the proceeds of these policies went, by means of the assignments of the policies as collateral, to the Bank.

■■■ We note that it is well settled that an insurance policy is a type of property which may be assigned as collateral. *In re Estate of Devine*, 628 N.E.2d 1227, 1229 (Ind.Ct.App.1994) (citing 43 Am. Jur.2d *Insurance* § 803 (1982)).[15] When an insured assigns an insurance policy, the

beneficiary is not divested of his or her general interest in the proceeds, but instead a lien is created in favor of the assignee to the extent of the debt owed. *Id.* (citing 43 Am.Jur.2d at § 802 (1982)).[16] Once the debt has been paid, the policy continues in effect as if there had been no assignment, and it is the assignee's duty to account to the beneficiary or the debtor's representative for the excess proceeds. *Id.* (citing Annotation, *Right of Life Insurance Beneficiary against Estate of Insured who used Policy as Collateral*, 91 A.L.R.2d 496, § 3 (1963)); *see also Smith v. Wells*, 72 Ind.App. 29, 122 N.E. 334 (1919) (assignment of insurance policy as collateral for loan did not deprive policy beneficiaries of their interest but instead required that such interest stand as security for insured's indebtedness), *reh'g denied by* 72 Ind.App. 29, 123 N.E. 644.

■■■ Here, there is no question that the Bank was entitled to the policy proceeds through action of Dr. Treadwell's assignment of the policies as collateral. Thus, the Bank received a total of $198,681.19 in life insurance proceeds. But for these assignments, the proceeds would have gone to the beneficiaries. The Appellees claim, under a theory of equitable subrogation, that they may recover from the Auburn companies the amounts which would have otherwise gone to them as policy beneficiaries.[17]

---

ficiaries, we refer to a guarantor's right vis-à-vis the principal debtor as "indemnification" or "indemnity."

15. This may now be found at 44 Am.Jur.2d *Insurance* §§ 784–791 (2003).

16. This may now be found at 44 Am.Jur.2d *Insurance* §§ 807, 809 (2003).

17. The Appellees make no cognizable argument that the Estate could seek "indemnity" for the money paid by the insurance companies to the Bank. Indeed, the Estate itself did

not pay these amounts to the Bank; the proceeds were rightfully paid to the Bank pursuant to the assignment agreements. Instead, the Appellees claim that the Estate, Cindee, and Misty have rights of equitable subrogation. It also does not appear that the Appellees claim that the Estate, as holder of the loan note, may recoup any of the insurance proceeds in that the proceeds have already been applied to the loan balance.

■ Because, generally, an insured who pledges a life insurance policy has the full power during his lifetime to make effective provisions as to whether his estate or the beneficiary under the policy should bear ultimate accountability for the unpaid debt after his death, the intent of the insured is a factor of controlling importance. 91 A.L.R.2d at § 2. Where it can be determined from the facts and circumstances that the insured did intend to allow reimbursement to the beneficiary, the beneficiary's right to subrogation will be recognized, and the beneficiary is entitled to be subrogated to the claim of the creditor against the estate of the insured where the creditor, instead of proceeding against the estate, obtains satisfaction from the proceeds of the policy which had been assigned to the creditor as security for payment of the insured's debt. 44 Am.Jur.2d *Insurance* § 812 (2003).

■ A slightly different issue is presented when the life insurance policy is not the only collateral securing a loan, and where the creditor collects from the insurance proceeds first. *See Devine*, 628 N.E.2d at 1230. In such a situation, a beneficiary seeking subrogation to the rights of the creditor is not merely asserting a right of a common creditor against the estate, but instead seeks to be subrogated to the position of the creditor, including the right to foreclose against any real estate securing the debts in an amount equal to that paid out of the policy proceeds. *Id.*; 91 A.L.R.2d at § 5[a]. In the words of the court in *Devine*, "absent express language to the contrary, subrogation is appropriate where it appears from all the facts and circumstances that the parties intended the real estate to be the primary security, and is inappropriate where the insurance policy was intended as the primary security." *Id.* Here, the Appellees claim that they are entitled to be equitably subrogated to the rights of the creditor and have a right to foreclose on the campground property owned by the Auburn companies.[18]

In *Devine*, the insured decedent owned a life insurance policy which he assigned as collateral for a loan which was also secured by a mortgage on his mortuary.[19] After the death of the insured, the bank elected to collect the life insurance proceeds of $41,475. The administrator of the estate then sold the mortuary for $240,000, and applied $133,424.30 to satisfy the balance of the debt, with the remainder going to the estate. The beneficiary under the policy, the decedent's sister who was not an heir under the decedent's will, received nothing from the estate. Thus, the estate had a portion of its debt paid from the life insurance proceeds which otherwise, as non-probate property, would have gone directly to the decedent's sister. The sister then filed a declaratory action claiming that the debt should have been paid from the proceeds of the sale of the mortgaged property first, rather than from the insurance proceeds. The estate moved for summary judgment, but the trial court granted summary judgment in favor of the sister.

Upon appeal, the estate relied upon language in the assignment which gave the bank the option of applying the proceeds of the policy without resorting to other security. The court concluded, however, that such language did nothing more than allow the bank discretion to elect to go after the policy proceeds first, and the fact that the bank chose to do so only showed

---

18. As noted, the property is now owned by Auburn Campground, but Auburn Cordage originally owned the property, and both companies are related and have filed a joint brief.

19. The mortgage apparently pre-existed the assignment. *Id.* at 1228.

that such was a quick means of obtaining part of the loan balance. *Id.* at 1230. The language of the assignment did not reflect whether the insured decedent expressly intended the insurance policy to be the primary collateral for the debt, and did not even refer directly to the debt. *Id.* Indeed, the court noted had that been his intent, the insured could have so provided, or exercised his right to change the beneficiary from his sister to either the bank or his estate; he could also have provided that his sister was to have no right of subrogation against his estate. *Id.* at 1230–31. The court further noted that the note evidencing the loan specifically referred to the mortgage as being security for the loan but made no mention of the earlier assignment of the life insurance policy. *Id.* at 1231. Lastly, the court observed that the mortgage did not require the decedent to provide additional collateral. *Id.* The court then concluded:

"having found no express language indicating that [the decedent] intended the insurance policy to be the primary security for his $170,000 debt, we must presume that he intended it to be satisfied from the mortgage held by [the bank].

Accordingly, this case is an appropriate one for equity to exercise its power to make an adjustment—via subrogation—'that will protect the beneficiary from having to pay the debt which was not hers to pay.' To hold otherwise would not only make the decedent's estate the beneficiary of the policy, but would also effectively make [the decedent's sister] primarily liable for the decedent's debt." *Id.* (citations omitted).

A similar result was reached in the earlier case of *Smith, supra,* wherein the insured Wells purchased a life insurance policy naming his third wife and children as beneficiaries. Wells subsequently borrowed just over $1,000. Although the loan was secured by a mortgage, the creditor required that Wells provide a life insurance policy to pay off the loan in the event of his death. 72 Ind.App. at 34, 122 N.E. at 336. When Wells died, $996.40 was still owed on the loan, and the life insurance policy paid out $1,250. The policy proceeds paid off the loan, and the remainder was distributed to the policy beneficiaries. Under Wells's will, his widow was the sole beneficiary. One of Wells's sons, who was a beneficiary under the policy, sued the widow and the banks, seeking payment for the amount of the life insurance which went to pay on the loan, and the trial court found in favor of the son.

Upon appeal, the *Smith* court stated that if the assignment of the policy deprived the beneficiaries of their interest in the proceeds, then Wells's son, as a beneficiary, had no right to subrogation; however, if the assignment did not so intend, then "a right of subrogation existed in favor of [the son], and he was entitled to a decree foreclosing the mortgage in question." 72 Ind.App. at 39, 122 N.E. at 337. Looking to the language of the assignment, the court noted that the assignment allowed the policy proceeds to pay off the loan and any remainder was to go to the beneficiaries. More importantly, the assignment specifically allowed the beneficiaries to be subrogated for purposes of a claim against the estate. 72 Ind.App. at 41, 122 N.E. at 338. Therefore, the court concluded that Wells's son was entitled to a decree foreclosing the mortgage to satisfy the amount due to him under the policy. 72 Ind.App. at 42, 122 N.E. at 338.

Thus, in both *Smith* and *Devine,* insurance policies were assigned as collateral to secure a loan which was further secured by a mortgage on property owned by the insured. When the policy proceeds were used to pay on the loan, as opposed to the creditor seeking foreclosure on the mort-

gages, the life insurance beneficiaries were allowed to be subrogated for a claim against the insured's estate. Here, none of the parties address the *Smith* case, but the parties do disagree as to the applicability of the holding in *Devine*. To us, neither case is directly on point.

In addressing this issue, however, we reiterate that there are five life insurance policies at issue here. We first address the four smaller policies issued by Fidelity which named Dr. Treadwell's children, including Cindee and Misty, as beneficiaries. Instead of Dr. Treadwell's children receiving the policies' proceeds upon his death, the Bank received the proceeds by way of the assignments. The Appellees argue that Cindee and Misty are therefore in the same position as the "deprived" beneficiary in *Devine* and should be subrogated to the rights of the Bank. However, unlike *Devine*, or for that matter *Smith*, here it was not the decedent or his estate which owned the mortgaged property which also secured the loan. In both *Devine* and *Smith*, the estates effectively received the benefit of the policies, which were nonprobate property, in that the proceeds were used to pay on the estates' monetary obligations. Thus, the insurance beneficiaries were in a sense made liable for the decedents' debts or, put another way, the estates became the effective beneficiaries of the policies. To prevent this inequity, where it did not appear that this was the decedents' intent, the courts allowed equitable subrogation.

In contrast, Cindee and Misty, as residual beneficiaries of the Estate/Trust, obviously have no interest in collecting their allegedly-deprived policy benefits from the Estate. Instead, they desire to be subrogated to the rights of the Bank and have the right to foreclose on the mortgaged property now owned by Auburn Campground. Although this position has some superficial appeal, we do not think that equitable subrogation is called for under these particular circumstances. The Appellees' position would allow the Estate, as guarantor, to have a portion of its obligations paid for by the policy proceeds, and also allow Cindee and Misty, who are the residual beneficiaries of the Estate/Trust, to in turn recover from the Auburn companies under a theory of equitable subrogation. Cindee and Misty would then be in a position to have the assets of the Estate/Trust, which they stand to receive, increased and also sue the mortgagor for the policy proceeds of which they were "deprived." However, by the Estate having the benefit of the policy proceeds paying on the loans it was obliged as guarantor to pay, and by Cindee and Misty being residual beneficiaries of the Estate/Trust, Cindee and Misty have already received, albeit in a roundabout way, the benefit of the policies. Equity simply does not demand Cindee and Misty be subrogated in this situation.[20]

■ This leaves us to address the larger insurance policy issued by Ohio Life. We take the Appellees' claim to be that the Estate should be allowed a claim of equitable subrogation because it was entitled to receive the proceeds from the larger policy, but because of the assignment, the Bank instead got the money to the benefit

20. Indeed, the entire amount of the four Fidelity policy proceeds went to pay toward the obligations of the Estate as guarantor, whereas Cindee and Misty each would have received only one-fourth of these proceeds were it not for the assignments. Thus, if anything, Cindee and Misty have indirectly received a benefit worth more than what they would have received under the policies. We express no opinion regarding whether Dr. Treadwell's other children, who were also beneficiaries under the policies, but not the residual beneficiaries of the Estate/Trust, would have any right of equitable subrogation.

of the Auburn companies. For a variety of reasons, we disagree.

The whole point of allowing equitable subrogation is to allow the beneficiary of an insurance policy to be compensated for the policy proceeds which, were it not for the insured's assignment of the policy as collateral, would have gone to the beneficiary, but because of the assignment, went to pay off the debts of the insured's estate. This is precisely what happened in both *Devine* and *Smith.* And in those cases, because it did not appear that the insured decedents intended that their beneficiaries be deprived of the benefits and their estates to be instead enriched thereby, the courts permitted the deprived beneficiaries to be equitably subrogated to the claims of the creditors. Here, we are not convinced by the Appellees' arguments that the Estate was a "deprived" beneficiary of the Ohio Life policy. Unlike the parties seeking to be subrogated in *Smith* and *Devine,* here the Estate was not the named beneficiary of this policy. Instead, Dr. Treadwell's former medical partner, Dr. Greenburg, was the named beneficiary. Characterizing Dr. Greenburg's still being the beneficiary as "inadvertent," the Appellees contend that by disclaiming his rights to the policy proceeds, the Estate became entitled thereto. The relevant portion of the Ohio Life insurance contract reads:

"BENEFICIARY. The Beneficiary is as shown in the application, unless it is changed.

If any Beneficiary dies:

1) simultaneously with you; or

2) within 15 days after you, but before [Ohio Life] has received proof of your death;

the proceeds will be paid to any surviving beneficiary.

If no Beneficiary survives, the proceeds will be paid to the Owner.

If the Owner does not survive either, they are payable to your estate." App. at 162.

Citing this language, and the designated affidavit of counsel for Ohio Life, the Estate now claims that, were it not for the assignment, it would have been entitled to the proceeds of the policy and should therefore be subrogated to the rights of the Bank and be able to foreclose on the mortgage securing the loans.

The affidavit of counsel for Ohio Life states:

"If the Bank had disclaimed payment under the assignment, and after receiving the disclaimer of [Dr. Greenburg], [Ohio Life] would have paid the proceeds to the insured's estate because he designated no beneficiary when ownership of the policy was transferred to [Dr.] Treadwell on October 23, 1986. Under the terms of the policy, the insured's estate is to receive payment if no beneficiary or owner survives him." App. at 338.

We have no reason to doubt that Ohio Life would have done as stated in the affidavit. However, even if Ohio Life would have paid the policy proceeds to the Estate had it not been for the assignment and the disclaimer, we disagree that this would support a claim of equitable subrogation by the Estate.

The Appellees do not explain, and we can find no reason why, pursuant to the clear language of the insurance contract, Dr. Greenburg was not the beneficiary of the policy; his name was that "shown in the application" and the beneficiary was not changed. Nor are we of the opinion that Dr. Greenburg's disclaimer of interest, *three years after* the death of his former partner Dr. Treadwell, acts to effectively change the beneficiary. Dr. Greenburg, as the named beneficiary and

pursuant to the holdings in *Devine* and *Smith,* would have been well within his rights to claim subrogation to the rights of the Bank when the insurance policy proceeds to which he would have otherwise been entitled to at the death of Dr. Treadwell instead went to the Bank by operation of the assignment. The Estate, however, under the terms of the insurance contract, was entitled to the proceeds only if "no Beneficiary survive[d]" and "the Owner does not survive either...." App. at 338. Here, although Dr. Treadwell did not survive, Dr. Greenburg did. To us, his disclaimer of interest left the Bank with the *only* claim to the insurance proceeds; it did not somehow transform what was by its very nature non-probate property into something that the Estate may now claim a right to. Again, we do not dispute that, hypothetically, if the policy had not been assigned as collateral and if Dr. Greenburg disclaimed his interest, that Ohio Life would have paid the proceeds to the Estate by default. We simply disagree with the notion that this somehow puts the Estate on an equivalent footing with the deprived beneficiaries in *Devine* and *Smith* and entitles the Estate to a claim of equitable subrogation.

In a footnote in their brief, the Appellees cite *Elliott v. Metropolitan Life Insurance Co.,* 116 Ind.App. 404, 64 N.E.2d 911 (1946), wherein two partners, Mr. Elliot and Mr. Lewis, had obtained life insurance policies on their respective lives. Originally, the policies were payable to the other partner. Eventually, the partnership was made the beneficiary of the policies, but no right to change beneficiaries thereafter was reserved on either policy. Although the partnership was subsequently dissolved, the partnership remained the named beneficiary of the policies. As part

of the dissolution, Mr. Lewis sold his interest in the partnership to Mr. Elliot, but none of the written instruments of the sale mentioned the policies. Instead, each partner kept possession of the policy issued upon his own life. When Mr. Lewis eventually asked Mr. Elliot to agree to change the beneficiary of Mr. Lewis's policy to Mr. Lewis's wife, Mr. Elliot refused. Mr. Elliot indicated, however, that he was trying to make Mr. Lewis "sweat" because he thought Mr. Lewis owed him money and that Mr. Elliot said that Mr. Lewis's wife would "get the money anyway" "if something would happen [to Mr. Lewis]." 116 Ind.App. at 419, 64 N.E.2d at 917. When Mr. Lewis died, both Mr. Elliot and Mrs. Lewis claimed entitlement to the policy proceeds. The trial court granted judgment in favor of Mrs. Lewis. Upon appeal, the *Elliott* court wrote that the policies were partnership property and the partners had the right to orally agree that upon dissolution, each would keep the policy on his own life. 116 Ind.App. at 420–21, 64 N.E.2d at 917. The court held that "under certain conditions and circumstances equity will apply equitable principles to aid in completing an incomplete change of beneficiary in an insurance policy." *Id.* Thus, the court upheld the judgment in favor of Mrs. Lewis.

In another case cited by the Appellees in a footnote, *Engelking v. Estate of Engelking,* 686 N.E.2d 932 (Ind.Ct.App.1997), an insurance policy on the decedent's life was owned by a partnership consisting of the decedent and the decedent's mother and sister.[21] The partnership was also the beneficiary of the policy. When the partnership was dissolved, the parties assumed the policy was worthless and made no provision for it in the distribution of the partnership's assets. When the decedent

---

**21.** The decedent's mother owned two-thirds of the partnership interest, and the decedent

and her sister each owned one-sixth of the partnership interest. *Id.* at 934.

died, her mother and sister claimed that they, as former members of the now-dissolved beneficiary partnership, were entitled to the policy proceeds. The decedent's estate claimed that it was entitled to the proceeds. Upon appeal, a panel of this court noted the holding in *Elliott,* and further noted the rule that where a partnership is dissolved, its debts paid, and its affairs wound up, any undistributed partnership property belongs to the former partners as joint tenants or tenants in common. *Id.* at 934. The court concluded that the policy was a partnership asset which was mistakenly assumed to be worthless and not distributed upon dissolution and that under such circumstances the former partners owned the policy as tenants in common according to their respective ownership interests in the former partnership.[22] *Id.*

We see no support for the Appellees' position in either *Elliott* or *Engelking.* In both of those cases, a dissolved partnership was the named beneficiary. Here, Dr. Greenburg was the named beneficiary and was still the named beneficiary when

Dr. Treadwell died. Moreover, here there was no refusal by anyone to change the beneficiary as in *Elliott;* instead there was simply no change in the beneficiary for whatever reason. In short, we conclude that the Estate is not in the same position as the "deprived" beneficiaries in *Devine* or *Smith,* and is not entitled to make a claim of equitable subrogation against either Classic City or the Auburn companies.[23]

To briefly summarize our conclusions regarding the life insurance policies, the Estate/Trust may, as the purchaser of the Note evidencing Classic City's loan, foreclose on the mortgage on the campground property and recover the remaining balance on the Note. However, Cindee and Misty have no claim of equitable subrogation since they, as residual beneficiaries of the Estate/Trust, have already received an indirect benefit by the Fidelity policy proceeds paying on a liability of the Estate. Similarly, none of the Appellees may properly be subrogated to the rights of the Bank for the amount of the proceeds of the Ohio Life insurance policy because none of

22. The Appellees' footnote also refers to the case of *Bowers v. Kushnick,* 774 N.E.2d 884, 887 (Ind.2002), which cites *Elliott* for the proposition that when the terms of the policy have not been met, substantial compliance is an equitable doctrine employed to aid in completing an incomplete change of beneficiary in an insurance policy. However, at issue in that case was a change of beneficiary form completed by the decedent prior to her death but delivered to the insurance company after her death. The *Bowers* court held that due to the particular policy language regarding the change of beneficiaries, the insured's actions constituted a change of beneficiaries and "[t]he issue of substantial compliance is not relevant." *Id.* at 888. The court, however, remanded on the question of whether a disclaimer by one of the named beneficiaries made the appellant the sole beneficiary—an issue not addressed by the trial court. *Id.* We find no support for the Appellees' position in *Bowers.*

23. Even if the Estate were the named beneficiary of the policy, this would not necessarily lead to the outcome desired by the Appellees. The *Devine* court, in addressing whether the assignment of the insurance policy in that case was intended to be the primary collateral, in which case subrogation would be inappropriate, observed that if the insured had intended the assignment to be the primary collateral, "he could have so provided, or he could have exercised his right, reserved under the assignment, to *change the beneficiary of the insurance policy from [his sister] to either his estate* or [the bank]." 628 N.E.2d at 1231 (emphasis supplied). If the Estate were the beneficiary of the policy, such would be an indication that Dr. Treadwell intended the assignment to be the primary collateral, in which case subrogation would be inappropriate. *See id.* at 1230.

these parties were beneficiaries who were "deprived" of the policy proceeds by virtue of the assignment. Dr. Greenburg, the only one who would have been entitled to subrogation, has since disclaimed his interest in the policy proceeds, leaving the Bank as the only party with rights in the insurance proceeds.

## IV

### Foreclosure

■ The Auburn companies briefly argue that the trial court exceeded its authority when it ruled that foreclosure was proper. The portion of the trial court's order in question reads:

"This Court now finds that a foreclosure on the real property and personal property described above is appropriate and that the Plaintiffs have priority over all other Defendants; there is no just reason for delay in entering this judgment, and the judgment is entered as a final appealable order. However, the Court does not yet order foreclosure pursuant to the bankruptcy stay." App. at 14.

The Auburn companies argue that this portion of the order is "so unclear as to be ineffective and should be reversed." Brief of Auburn Cordage at 19. They also argue that the issue of foreclosure was not within the scope of the partial lifting of the bankruptcy stay.

The Bankruptcy Court's order granting relief from the stay allowed the Appellees to proceed with the action against Classic City and the Auburn companies "in order for the [trial court] and any appellate court in the State of Indiana on direct appeal to determine the proper amount of any claim held by [the Appellees] against the [Appellants] and the extent to which any claim by [the Appellees] against the [Appellants] is secured by the real property subject to the state court action." App. at 418A–418B.

However, the order made clear that the Appellees were in "no way permitted to execute upon any asset of the Debtor's Bankruptcy Estate without further order from this Court." Id.

The Bankruptcy Court's order allows Indiana courts to determine the amount of the claims held by the Appellees against Classic City and the Auburn companies and the extent to which any claim is secured by the campground property. This is precisely what the trial court did. It made a determination, which we now partially reverse, that the Appellees had a claim in certain sums against the Auburn companies, specifically that the Appellees had a right to seek foreclosure on the mortgaged property owned by the Auburn companies. The trial court's determination that foreclosure was appropriate simply expresses that the trial court found that the Appellees' claims were secured by the mortgage on the campground land. Indeed, the Auburn companies do not explain how the trial court could have determined the extent of the Appellees' claims against them and the extent to which such claims were secured by the campground property without determining that foreclosure was available. With regard to that portion of the trial court's order which declines to actually order foreclosure, it appears that the trial court was simply trying to comply with that part of the Bankruptcy Court's order which forbade the Appellees to execute upon the assets of Classic City. Although the campground property might not actually be an asset of Classic City itself, we are unable to determine how the Auburn companies are prejudiced by the trial court's decision *not* to order foreclosure on the campground property. Suffice it to say that we see nothing so unclear about the trial court's order to require reversal, nor are we of the opinion

that it violates the Bankruptcy stay.[24] To the extent that it might, this is an issue for the Bankruptcy Court in the exercise of its exclusive jurisdiction over issues of bankruptcy law.

## Conclusion

The trial court properly concluded that the loan was in default and that the mortgage was supported by sufficient consideration. Although the Estate as guarantor may have had a right to seek indemnity from Classic City for the amounts the Estate paid on Classic City's loans, and the Estate as the holder of the Note may seek payment on the balance of the loan, the Appellees are not entitled to equitable subrogation with regard to the insurance policy proceeds. Finally, the trial court did not err in concluding that foreclosure was appropriate.

The judgment of the trial court is affirmed in part, reversed in part, and the cause is remanded for proceedings not inconsistent with this opinion.

KIRSCH, C.J., and DARDEN, J., concur.

---

24. Of course, we reverse the trial court's order to the extent that it would have allowed foreclosure via equitable subrogation. The Estate may now seek foreclosure only as the holder of the Note evidencing the loan which was secured by the mortgage.